1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF TEXAS

3             GALVESTON DIVISION

4  UNITED STATES OF AMERICA              3:15-cr-15-11
                                         3:15-mj-21-1
5

6  VS.                                   June 10, 2015
                                         Houston Texas
7                                        1:39:56 p.m.
   DENNIS P. M HUGHES
8

9        PRELIMINARY AND DETENTION HEARING

10            EXCERPT OF PROCEEDINGS

11      TESTIMONY OF SPECIAL AGENT KELLY BERRY

12    BEFORE THE HONORABLE JOHN R. FROESCHNER

13            UNITED STATES MAGISTRATE

14  APPEARANCES:

15  For the United States          Sherri Zack, AUSA
                                   U. S. Attorney's Office
16                                 1000 Louisiana
                                   Suite 2300
17                                 Houston, Texas 77002

18  For the Defendant              Neal Davis
                                   Attorney at Law
19                                 917 Franklin
                                   Suite 600
20                                 Houston, Texas 77007

21  Case Manager                   Shelia R. Anderson

22  Electronic Recording Operator  Cathy Carnew
                                   U. S. District Clerk's
23                                      Office
                                   601 Rosenberg
24                                 Galveston, Texas 77520

25
   Proceedings from official electronic sound recording;
   transcript produced by court approved transcriber

   DIGITAL SCROLL TRANSCRIPTION                281.382.9862

INDEX

Page

<u>WITNESS FOR THE GOVERNMENT</u>:

    Special Agent Kelly Berry

        Direct Examination by Ms. Zack      3
        Cross Examination by Mr. Davis      17
        Redirect Examination by Ms. Zack    33
        Recross Examination by Mr. Davis    34

1      (Excerpt of proceedings.)

2              THE COURT:  All right.

3                  All right.  Then, I'm ready to go as well.  So,

4    call your first witness.

5              MS. ZACK:  Yes, Your Honor.  Thank you.

6                  At this time, the United States would call

7    Special Agent Kelly Berry.

8              THE COURT:  All right.  If you would raise your right

9    hand for me, please.

10      (Witness sworn by Court.)

11              SPECIAL AGENT BERRY:  I do.

12              THE COURT:  Okay.

13                  Please be seated.

14                  Whenever you're ready, Sherri.

15      SPECIAL AGENT KELLY BERRY, GOVERNMENT'S WITNESS, SWORN

16                      DIRECT EXAMINATION

17   BY MS. ZACK:

18   Q    Can you please state your name for the record?

19   A    My name is Kelly Berry.

20   Q    And how are you employed?

21   A    I'm a Special Agent with the FBI.

22   Q    And how long have you been so employed?

23   A    Eight years.

24   Q    And to what group or unit are you assigned?

25   A    I'm assigned to the Texas City Resident Agency in Texas

1  City.

2  Q    And as part of that assignment, are you entrusted to

3  investigate crimes that involve the sexual exploitation of

4  children online.

5  A    Yes.

6  Q    And to that end, did you become involved in an

7  investigation that led to the arrest of Dennis Hughes?

8  A    Yes.

9  Q    Could you please describe to the Court how it is that the

10  FBI Houston Office got involved in that investigation?

11  A    This investigation is part of a larger international

12  investigation being connected by the FBI and our partners

13  overseas.  And because it's ongoing, I would like to refer to

14  the website that we found Dr. Hughes on as Website A.

15        MS. ZACK:  Your Honor, if that would be okay with the

16  Court and defense, as long as we refer to everything as either

17  Website or Network A in this.

18        THE COURT:  Any objection?

19        MR. DAVIS:  I don't have any objection, Your Honor.

20        THE COURT:  Sure.

21        MR. DAVIS:  If I need to know, I will just ask her

22  privately, but I'm fine.

23        THE COURT:  Okay.

24        MS. ZACK:  We're going to make all of that available

25  -

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1          THE COURT:  Sure.

2          MS. ZACK:  -- if and when Mr. Hughes is indicted.

3          THE COURT:  Sure.

4          THE WITNESS:  As part of the international

5    investigation, the host computer, the host server for this

6    Website A was seized, and when it was seized it was operated

7    by law enforcement in March and April – or in February and

8    March – excuse me – of 2015.

9              During that time investigators were monitoring

10   the log-ons and activities of users on that website.  Every

11   user has a unique user ID for which they have a user name and

12   a password.  And this website is not available on traditional

13   internet.  It's available on a network of distributed

14   computers that mask a user's IP address.  And how law

15   enforcement typically finds users who are conducting illegal

16   activity is they use the IP address at date and time and are

17   able to subpoena the internet service provider to find out who

18   the user is at – or where the – where is – the home is.

19             In this case, we were unable to do that, because

20   the IP address was masked through this network.  So, what the

21   investigators did –

22   BY MS. ZACK:

23   Q   Let me ask you a question before you get to what they did.

24             So, in order to use that network, an individual

25   has to purposely elect to go there?

1   A   Yes.  Yes.  They have to - you can buy commercially

2   available software applications in order to get on to that,

3   that network.

4   Q   And the purpose of using that network is so that nothing

5   can be traced back to you; is that –

6   A   That's correct.

7   Q   Okay.

8   A   Because what's – what uses it is a series of different

9   computers, IP addresses, and so it bounces back and forth, and

10   it's hard for investigators to trace back to who the original

11   user of that information is, so.

12   Q   Okay.  So, knowing that you could not go the traditional

13   route, how was the investigation furthered?

14   A   So, what – what ended up happening was the investigators

15   received a court authorized – or they conducted a court

16   authorized network investigative tool, where they sent

17   information.

18              When people were logged on to the website, they

19   sent information out to those user's computers in – so that

20   those computers would respond back to the investigators with

21   the actual IP address, date and time.

22   Q   Okay.  And when that was done, how was it that that led

23   ya'll to Dr. Hughes?

24   A   We – the – again, subpoenaed his internet service

25   provider, and the internet service provider stated that at

1  that date and time the IP address was being used at Dr.

2  Hughes' address.

3  Q    And was that in Pearland?

4  A    That was in Pearland, Texas.

5  Q    Which is within the jurisdictional limits of the Southern

6  District of Texas?

7  A    Yes.

8  Q    Okay.

9             Now, once you had that information – let me ask

10 you this:  Before we get to you knew where the house was, what

11 information did FBI or your law enforcement partners have that

12 indicated activity involving child pornography?

13 A    They were investigating the website.  They knew that the

14 website had child pornography on it.  It was a bulletin board

15 and a website.  They – where people posted different kinds of

16 information; they posted photographs, and people could access

17 those photographs and, you know, have online communication

18 with other people who had a similar interest?

19 Q    Now, was there an account or an identity that you believe

20 – or that turned out to be Dr. Hughes?

21 A    Yes.

22 Q    But at the time you did not know that's who it was?

23 A    Right.

24 Q    What did you know about that identity online?

25 A    There was a – there was a user ID, and the user name was

1  Acqmed (phonetics) and the password was unknown to us.

2  Q    Okay.  And what was that individual with that user name

3  doing?

4  A    That individual at the time we were monitoring had

5  accessed a – more than one child pornographic image.

6  Q    Okay.  And can you describe for the Court any of the

7  images that were accessed with the titles of the files?

8  A    One of the images that was accessed was called Man – "Man

9  Fuck Preteen Latina."  And in those images – there were

10  sixteen of them – in those images there was a pubescent female

11  lying naked on a bed.  In some of the images she was on her

12  back and a clothed adult male was – had his mouth on her – on

13  her chest and in her genital area in some pictures.  In

14  another picture, he was spreading open her vagina.

15                  In other pictures, she was laying on her stomach

16  naked and he was naked on top of her.

17  Q    And based on your training and experience, did those

18  images meet the federal definition of child pornography?

19  A    Yes.

20  Q    Okay.

21                  So, with that information, you then do what?

22  You obtain the search warrant for the Pearland address?

23  A    Yes.

24  Q    Okay.  And when was that warrant executed?

25  A    The warrant was executed on Friday, June 5th.

1  Q   Okay.

2             And was the Defendant present during the

3  execution of that warrant?

4  A   Yes.

5  Q   And who else was present in the home?

6  A   His wife, Claire, was present and his three children.

7  Q   Okay.

8             And did you seize any computers, computer media?

9  A   Yes.

10  Q   And was – what do you do with that stuff at the time?

11  A   At the time, we previewed it to –

12  Q   What does that mean?

13  A   So, went through a forensic exam onsite where we could

14  forensically lock down the computer, just view images and see

15  what was on the computer and seized those media that either

16  had child pornography on them or those which we could not

17  preview at the time.

18  Q   And at the time, did you – during that preview, did you

19  see or do whoever was doing the preview – did you see images

20  that met the federal definition of child pornography?

21  A   Yes.

22  Q   Consistent with the type of thing you have already

23  described?

24  A   Yes.

25  Q   Okay.  And were you able to determine who used those

1  computers or media storage devices?

2  A   Yes.

3  Q   And who was that?

4  A   That was Dennis Hughes.

5  Q   Okay.  Did you have an opportunity to speak to Mrs.

6  Hughes?

7  A   Yes.

8  Q   And did you determine whether or not she had any knowledge

9  or participation in any of this?

10  A   She – she said she had no knowledge.

11  Q   Okay.  And were you confident based on your investigation

12  that she did not participate in any way in this?

13  A   Yes.

14  Q   When all of this came to light, how did she appear as far

15  as knowledge?

16  A   She was shocked.  She was – so, that – that made me

17  believe that she didn't have any knowledge.

18  Q   And did you have an opportunity to speak to Dr. Hughes?

19  A   I did not speak to him.  I did not interview him, but

20  federal agents did.

21  Q   Okay.  And could you summarize the interview as far as

22  what Dr. Hughes told them about whether or not he was the

23  individual accessing that network –

24  A   Um-hmm.

25  Q   -- and such?

1  A    Yes.  He – he stated that he was the user who signed in as

2  Acqmed (phonetics).  He told of the possible password or a

3  variation thereof.  He stated that he would go on to the

4  network and would access a form of Wikipedia to find images

5  that he wanted to see.

6  Q    And did he indicate that he received child pornography

7  images via the internet, either through this network or other

8  means?

9  A    Yes, he did.

10  Q    And did he acknowledge that he had possessed child

11  pornography in the residence?

12  A    Yes, he said that he currently had child pornography on a

13  white thumb drive.

14  Q    And did you seize that white thumb drive?

15  A    Yes.

16  Q    Is that being analyzed?

17  A    Yes.

18  Q    Now, let me ask you this:  Did the agents that interviewed

19  Dr. Hughes discuss with him his viewing habits – how often he

20  did this, when he did this, things like that?

21  A    Yes.

22  Q    And what did you learn?

23  A    He said that he reviewed – a lot of times a trigger for

24  him to view child pornography was anger.  Let me back up a

25  little bit.

1          He actually has been looking at child

2    pornography since the late 1990s.  He began looking at

3    magazines.  He said he began looking at images of women who

4    were legal – of legal age but were dressed to look like they

5    were younger.  And he became interested in younger and younger

6    women, that his current interest is women who are entering

7    puberty and that he searches the internet for – for those

8    types of images.

9    Q   Does he keep them in any particular place; does he delete

10   them; did he discuss those types of behaviors?

11   A    Yes.  So, he keeps the mechanism for which he gets on to

12   the network, as well as his photographs on a hard drive – on a

13   thumb drive and would often feel guilty about what he had

14   done.  He knew what he was doing was wrong.  He's Catholic,

15   and would confess to a priest and would erase the images and

16   then would be done with it.

17          He said that he would take a break from it.

18   Sometimes it would last a day; sometimes it would be a year

19   before he would start again.  And what I mentioned earlier

20   about the triggers, sometimes he would be angry about

21   something, and so he would use that as a release.

22   Q   And did he discuss at what time of day he would typically

23   do this?

24   A    He stated that he doesn't sleep very often – or very much,

25   so he would do it often at night after his family was asleep.

1  Q   And based on your investigation, was anyone in his family

2  aware of what was going on?

3  A   No.

4  Q   Now let's discuss some other aspects of your

5  investigation.

6              Were you able to determine in the course of your

7  investigation whether or not he was employed, Dr. Hughes was

8  employed?

9  A   Yes.

10 Q   And where is he employed?

11 A   He's employed at M.D. Anderson.

12 Q   And do you know what type of physician he is?

13 A   He's a Physician Scientist, and he specializes in

14 osteosarcoma and melanoma.

15 Q   Okay.  Those are types of cancers?

16 A   Yes.

17 Q   And what is the age group of his patients that –

18 A   He works at the –

19 Q   Or what type of research he does?

20 A   He works at the Children's Hospital, so he works with

21 children.

22 Q   Okay.

23 A   And I believe his patients range in age from six months to

24 twenty-seven years.

25 Q   Now, as far as computer access at work, did you discuss

1  the computers at work with either M.D. Anderson or their law

2  enforcement entity?

3  A    Yes, we discussed that with the UT police.

4  Q    Okay.  And did the University of Texas police have

5  jurisdiction over M.D. Anderson based on their partnership

6  with the University of Texas?

7  A    Yes.

8  Q    And what did you learn from your discussions with the UT

9  police?

10  A    UT police seized his work computer and had it forensically

11  analyzed, and their analysis discovered that there were child

12  pornography images on that computer.

13  Q    Now, can you discuss what you learned about Dr. Hughes'

14  interactions with patients?

15  A    Dr. Hughes is a scientist.  He does most of his work in a

16  lab, but he does see patients.  He – there were interviews

17  conducted with his fellow workers.  While the policy at M.D.

18  Anderson is not rigid, Dr. Hughes did say that he never sees a

19  patient without another employee accompanying him, and we

20  confirmed that, that he takes a registered nurse in with him

21  to see patients.

22            One thing that his fellow doctors thought was –

23  was a little bit strange in hindsight was that when he's seen

24  a patient who has melanoma the other doctors typically will

25  refer those patients to the dermatologist for like a full body

1  scan, but Dr. Hughes typically did those himself.

2  Q   And these were interviews conducted since you got the

3  search warrant and Dr. Hughes' arrest last Friday?

4  A   Yes.

5  Q   Okay.

6              Let's talk about his activities within the

7  community with his children, things like that.

8              What did you learn about his non-work

9  activities?

10  A   He's very involved in a lot of children's activities.  His

11  children attend St. Vincent DePaul Catholic School in Houston,

12  where he did a – was – participated in a program – I think

13  it's called the Lord's Day – and it basically was where he

14  would go around to children's classrooms and sing with them.

15  He did that for about seven years.

16              He also helps his wife, who is with the Parent

17  Teacher's Organization, the PTO.  She was in charge of the

18  year book for several years, and people at St. Vincent DePaul

19  noted that he was at the school an awful lot taking pictures

20  of children, just in their daily activities – drop off, in the

21  cafeteria, things like that.  And he would be there taking

22  pictures beyond the deadline to turn pictures in to the – to

23  the yearbook.

24              He was a fixture at Children's Chapel.  He was

25  involved with baseball at the Pearland Little League.  He was

1  a registered parent volunteer.  He had been an assistant coach

2  and had applied to be a head coach but was denied this year to

3  be a head coach.

4  Q   Why was that?

5  A   There was an incident last year involving Dr. Hughes and a

6  child.  He had pushed a child down.  There was an argument

7  about base running, and he had pushed a child down.  So, he

8  was denied head coaching for that.

9          Dr. Hughes is signed up – was signed up to this

10 week to do music and dance with the children at Vacation Bible

11 School at St. Vincent DePaul.  And he was also signed up to be

12 his son's – both of his son's basketball coach this summer.

13 Q   So, as best you can tell, Dr. Hughes puts himself in a

14 position to be constantly surrounded by children?

15 A   Yes.

16 Q   And did you determine – you were present at the home; is

17 that correct?

18 A   Yes.

19 Q   Approximately, how far is the home from schools in that

20 area?

21 A   There are two elementary schools within a mile of his

22 home.

23 Q   And as far as parks and things like, are there areas where

24 children congregate – close community schools, things like

25 that, in the area?

1  A   Yes, he lives in the Silver Lake community, and it has –

2  there are parks and pools in that community.

3  Q   It's a planned community?

4  A   Yes.

5  Q   Okay.

6                 Are you aware of whether or not Dr. Hughes has

7  traveled extensively for work?

8  A   I don't know.  I know that he had a plan that – to travel

9  to Greece, I believe, upcoming that he canceled.

10  Q   So, in order to do that, he would have to have a passport;

11  is that correct?

12  A   Yes.

13          MS. ZACK:  Pass the witness.

14          THE COURT:  Cross examination, Neal?

15          MR. DAVIS:  Thank you, Your Honor.

16          THE COURT:  Sure.

17                      CROSS EXAMINATION

18  BY MR. DAVIS:

19  Q   Good morning, Agent Berry.

20                 In this case, the search warrant was signed by

21  which Judge?

22  A   Judge John R. Froeschner.

23  Q   And that's the Magistrate present here today hearing the

24  case, correct?

25  A   Yes, sir.

1  Q  So, in order to sign the warrant, he actually reviewed

2  what's called the Probable Cause Affidavit, right?

3  A  The search warrant?  Yes.

4  Q  And that was an affidavit that you swore to or another

5  agent swore to?

6  A  I swore to.

7  Q  And – and so, he's familiar with all of the information

8  that's in that affidavit, correct?

9  A  Yes.

10  Q  And the warrant in this case was not what's called a no-

11  knock warrant, correct?

12  A  Right.

13  Q  A no-knock warrant is a warrant you can get if you think

14  there's a realistic or a serious threat to your safety or

15  evidence being destroyed, right?

16  A  Yes, sir.

17  Q  When you executed the warrant, did you knock on the door?

18  A  Yes.

19  Q  Who answered?

20  A  Dr. Hughes.

21  Q  When he answered the door, did he let you into the house?

22  A  Yes.

23  Q  Was he cooperative?

24  A  Yes.

25  Q  Did he answer all of your questions?

1  A   He did.

2  Q   Did he try to go anywhere?

3  A   No.

4  Q   Flee?

5           Any furtive movements by him?

6  A   No.

7  Q   Did he try to destroy any evidence?

8  A   No.

9  Q   Did he talk about leaving or fleeing at some point with

10 you guys?

11 A   No.

12 Q   Did he tell you where the location was of the child porn

13 that he had downloaded?

14 A   Yes.

15 Q   And that child porn was on several different thumb drives,

16 right?

17 A   Yes.

18 Q   And was it also on a hard drive?

19 A   Uh - -- I don't –

20 Q   You do now know yet?

21 A   I don't know yet.

22 Q   Okay.  But in any event, he told you what his viewing

23 habits were?

24 A   Yes.

25 Q   Down to the point that he would go to confession because

1  he felt guilty about what he had done and even stopped for a

2  period of time, right?

3  A    Yes.

4  Q    He told you, basically, the number of – or the period of

5  downloading that he had done with these images, right?

6  A    Yes.

7  Q    Did he tell you the number of images that he downloaded?

8  A    He said that there would be ten gigs of images on the hard

9  drive.

10  Q    So, would you agree with me that he didn't try to minimize

11  – as far as you know, he didn't try to minimize the

12  downloading or the images, right?

13  A    No.

14  Q    He didn't deny it, right?

15  A    No.

16  Q    You've had situations where people try to deny or minimize

17  downloading pornography, right?

18  A    Yes.

19  Q    You have people who say – you handle a lot of these – who

20  claim they didn't even know it was on their computer, right?

21  A    Yes.

22  Q    People who claim that perhaps someone logged on to their

23  computer and mysteriously this material appeared, right?

24  A    Yes.

25  Q    Almost laughable?

1   A    Um-hmm.

2   Q    But in this case, the doctor really did cooperate with you

3   guys, right?

4   A    He did.

5   Q    Do you – were you present, or do you know that there was a

6   point where an agent – the agents were leaving and he actually

7   said, hey, there is this other drive and he gave it to one of

8   the agents; did you see that?

9   A    I didn't see that.

10   Q    Okay.  Are you aware that that happened that he gave one

11   of the agents that may have missed the location where it was a

12   drive?

13   A    I was – I didn't see that.

14   Q    Okay.

15   A    I don't know.

16   Q    So, you don't have any knowledge one way or the other

17   about it?

18   A    I don't.

19   Q    Was there a sense when you showed up – was there a sense

20   that he was a little relieved at all?

21   A    You could – yeah, I would say maybe so.

22   Q    That maybe he had been living with this secret for a long

23   time and that it was almost a relief that he had been caught?

24   A    Yes.

25   Q    Did he talk to you about how he was afraid to get help?

1  Did he say anything about that?

2  A    No.  I didn't hear that.

3  Q    Okay.

4           Did you talk about anything other than the

5  trigger being anger, about why he may have done this?

6  A   He said also that he didn't sleep much, and so he would –

7  I guess he had to work like through the night sometimes and so

8  it was also like a Dopamine rush for him, and so it kind of

9  woke him up and refreshed him for a day if he didn't have much

10  sleep in the night.

11  Q   Did he tell you anything about a prescription drug he was

12  taking – I can't recall the name – but it was like a – a – it

13  was like an upper that would keep him up to be able to do his

14  work?  Did you know anything about that?

15  A   We saw a prescription in his office, but I – he – I don't

16  recall him saying what it was for.

17  Q    Okay.

18           Now, the charge, just to be clear, he's charged

19  with receiving porn, child pornography?

20  A    Yes, sir.

21  Q    And possessing child pornography, right?

22  A    Yes.

23  Q    The United States Government has a choice in these cases

24  really to have discretion whether to charge with just

25  receiving and possessing or just possessing, right?

1  A    Yes.

2  Q    And it – it's kind of a truism or true that someone who

3  possesses something had to have received it at some point,

4  right?

5  A    Yes.

6  Q    That is just common sense.

7                 So, you guys don't have any particular written

8  guidelines on how someone is charged with receiving and

9  possession or possession or do you or –

10 A    Written guidelines –

11 Q    -- presenting stuff to the agent and the prosecutor?

12 A    We just follow the – we follow the statute.

13 Q    Okay.

14 A    So, you know -- I mean, I guess somebody could actually

15 possess it, if they had created it.

16 Q    Okay.

17                 But then, they would be charged with possession

18 and manufacturing?

19 A    Yes.

20 Q    Okay.  And because it's a receiving charge, that's what

21 places it at a five-year mandatory minimum, right?

22 A    Yes.

23 Q    And just so it's clear, you also, in addition to being an

24 agent, you also have a law degree, right?

25 A    Yes.

1 Q   And are you licensed to practice law as well?

2 A   Yes.

3 Q   Okay.

4           There's no evidence in this case that you have

5 that he actually had any inappropriate contact with children,

6 right?

7 A   We don't have any information that says that.

8 Q   Now, as part of your investigation after Mr. Hughes was

9 arrested, as part of the United States Government and your

10 police powers, you want to make sure that the public welfare

11 is protected, right?

12 A   Yes.

13 Q   And so, what you did is you contacted M.D. Anderson,

14 right?

15 A   Yes.

16 Q   And that was Dr. Hughes' place of employment for the last

17 eight or nine years?

18 A   Yes.

19 Q   And you informed them of the arrest and the charges,

20 correct?

21 A   Yes.

22 Q   And you also gave them a copy of the Complaint, right?

23 A   Yes.

24 Q   And the Complaint is fairly detailed; it basically

25 encapsulates what you testified to, except for the things that

1  happened after the Complaint was filed, right?

2  A   Yes.

3  Q   And so, it actually went into some brief descriptions of

4  the pornography that was downloaded and so forth, right?

5  A   Now, I should say that we involved the University of Texas

6  police before we – we did the search warrant.

7  Q   Okay.

8  A   And then, we provided a copy of the Complaint after it was

9  made public.

10  Q   Okay.  So – but M.D. Anderson has been aware of it, and

11  they have conducted their own internal investigation, right?

12  A   Yes.

13  Q   In fact, last night at about 7:00 p.m. they held a press

14  conference, correct?

15  A   Yes.

16  Q   And at the press conference they said that they are

17  working as quickly as possible to contact Dr. Hughes'

18  patients, but thus far, they've interviewed a couple of

19  hundred or a couple of thousands – I don't know how many – not

20  all of them but so far they have not learned – or there's been

21  no allegation that he improperly touched or photographed or

22  anything like that any of these patients

23  A   I did not see the press conference, but –

24  Q   That may be the wrong question.

25             But do you have any knowledge that M.D. Anderson

1  has uncovered any improper contact?

2  A    No.

3  Q    Now, M.D. Anderson apparently released a statement saying

4  that there were no computer breaches, right?

5  A    Yes.

6  Q    And I've talked to the prosecutor, and you've testified;

7  we don't even know what that means.  But we do know that

8  apparently the M.D. Anderson police located some child

9  pornography on Dr. Hughes' computer at the office, correct?

10 A    Yes.

11 Q    And is it possible that – and I'm not saying this is

12 necessarily the case – but isn't it possible that if he had a

13 thumb drive, put it in the work computer to watch –- look at a

14 child pornography that there's going to be images on that

15 particular computer?

16 A    Yes, that's possible.

17 Q    So, we don't really know if he was actually using that

18 computer to download child pornography, right?

19 A    That's true.

20 Q    And don't yet have a full report, but we've just been

21 notified that there may be or there are some images on that

22 particular work computer?

23 A    That's correct.

24 Q    There are no images of any pornography regarding patients

25 or anything like that on these other computers?

1   A   Not that we've seen.

2   Q   Okay.

3             You understand that he's what's called a

4  Physician Scientist, I guess, at M.D. Anderson?

5   A   Yes.

6   Q   And you're aware that he's got an M.D. and a Ph.D. from

7  Yale University?

8   A   Yes.

9   Q   And a Physician Scientist apparently is someone who does

10  some clinical work, which in this case is about 20 percent, I

11  guess, with actual patients, right?

12   A   Yes, sir.

13   Q   And then, he does eighty percent of laboratory research?

14   A   Yes.

15   Q   In that laboratory research he has people actually working

16  under him, right?

17   A   Yes.

18   Q   And those people are, like, medical students or Ph.D.

19  students, things like that?

20   A   That's what I understand.

21   Q   And whenever – and also apparently he's like a tenured

22  professor there; is that your understanding?

23   A   Yes.

24   Q   Do you know anything about tenure, because – the reason

25  why I ask is my understanding is that M.D. Anderson has put

1  him on paid leave; is that your understanding?

2  A   That's what I understand, yes.

3  Q   Is that because he's tenured, because it's more difficult

4  if someone's a tenured professor just to terminate them?  Or

5  do you know?

6  A   I understand that there are several privileges that come

7  with being tenured.

8  Q   Right.

9  A   But I don't know if that's why –

10  Q   Okay.

11  A   -- they did what they did.

12  Q   Okay.

13             And his privileges, just to be clear, have been

14  suspended.  So, basically, he can't go over there at this

15  point, to your knowledge, right?

16  A   Correct.

17  Q   And it sounds like M.D. Anderson really doesn't want him

18  over there?

19  A   I guess.

20  Q   At this point?  From what we're trying to figure out.

21             Okay.  The prior travel that he was involved in

22  was purely work related, correct?

23  A   The travel that I mentioned earlier?

24  Q   Yes, ma'am.

25  A   I believe so.

1  Q   Is it fair to say that he's a pretty well-known and

2  recognized specialist in his area, correct?

3  A   Yes.

4  Q   And so, he would invited to go speak overseas at various

5  conferences?

6  A   Yes.

7  Q   And the one coming up in Greece obviously isn't going to

8  happen, so that's been canceled, right?

9  A   That's what I understand.

10 Q   And are you aware he canceled it, whether it was his wife

11 or another?

12 A   I believe he was talking to somebody at his office.

13 Q   Okay.  And you were courteous about letting him make some

14 calls, I think, after he was arrested to try to square some

15 things away?

16 A   Yes.

17 Q   Square some things away because he was going to jail?

18              Okay.  And as part of that, he actually

19 contacted M.D. Anderson, right?

20 A   Yes.

21 Q   Some employees there?

22              He called his parents, I think, to your

23 knowledge?

24 A   Yes.

25 Q   Did you hear him talk to his parents?

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1  A    Yes.

2  Q    Did he basically tell them what had happened?

3  A    Yes, he did.

4  Q    He didn't try to lie or mislead them at all; did he?

5  A    No.

6  Q    Okay.

7            As far as the kids' activities go, you are aware

8  that his kids go to a Catholic school, right?

9  A    Yes.

10 Q    Are you aware that schools, generally parochial schools

11 really try to encourage parents to get involved after school?

12 A    Yes.

13 Q    Is that right?

14           And he's got three children, right?

15 A    Yes.

16 Q    Five to ten years old and somewhere thereabouts?

17 A    Yes.

18 Q    And all those kids attend the school?

19 A    I think at least two of them do.

20 Q    Okay.

21           Not sure about the third one yet?

22 A    Right.

23 Q    Whether he may be entering school there?

24           And is it fair to say that that particular

25 school is a pretty close-knitted school?

1    A    I assume so.

2    Q    A lot of parental involvement from the parental – from the

3    parents, as far as you know?

4    A    Yes.  It was, however, the – the principal who said that

5    teachers thought it was odd that he was there as much as he

6    was –

7    Q    He was taking photos –

8    A    -- taking pictures.

9    Q    But his wife is actually on the – are you aware that she

10   heads the school year book?

11   A    Yes.

12   Q    Okay.

13                   And you have, as well, as part of your police

14   duties notified the Catholic school there of what's occurred,

15   right?

16   A    Yes.

17   Q    And you met there with the priest of the school and the

18   principal, right?

19   A    Yes.

20   Q    And shared with them the basic allegations?

21   A    Yes.

22   Q    And I think it was yesterday – they sent out, basically, a

23   blast bulletin to all the parents notifying them, correct?

24   A    Yes.

25   Q    Basically said, pray for his family, pray for law

1 enforcement, you know, pray that this – things get resolved?

2 A    Yes.

3 Q    And so, have you guys – you guys, since – and they

4 actually I think listed your name –

5 A    Yes.

6 Q    -- on the email.

7              But no one has contacted you about him, any

8 inappropriate behavior between him and any of the kids at the

9 school, correct?

10 A    I did receive one phone call.

11 Q    Okay.

12 A    From a mother of a bilingual student.  She said that –

13 that Dr. Hughes was trying to put together a video of

14 children, I guess, speaking Spanish, talking about melanoma.

15 Q    Okay.

16 A    And they had not gotten to the point where they had shot

17 the video yet, but that he had shown some – those children and

18 maybe some of the parents a video of the English speaking

19 version of the melanoma video.

20 Q    Okay.  And maybe I should rephrase it.

21              But no allegations of sexual –

22 A    Oh.

23 Q    -- touching or anything like that?

24 A    No, just things that they thought strange.

25 Q    And do you know the circumstances under which he – when he

1  saw some of those patients and didn't perform like other

2  doctors, do you understand under which circumstances those

3  were, or are you just generally saying that's what happened?

4  A   He stated that he – one of the – one of the physicians

5  stated that he – he did that in his words because he wanted

6  his department to receive billing for that and not

7  dermatology, to keep the money in – in his department as

8  opposed to allowing dermatology to – to bill for that.

9  Q   Okay.

10  A   But other doctors didn't do that.

11  Q   Okay.

12             No further questions, Your Honor.

13          THE COURT:  Any Redirect?

14                  REDIRECT EXAMINATION

15  BY MS. ZACK:

16  Q   You indicated that you saw the prescription.  Do you know

17  who wrote that prescription for him?

18  A   I don't.

19  Q   And you don't know what it's for?

20  A   I don't know what it's for.

21  Q   Okay.  And he told you that – Dr. Hughes told you that he

22  had confessed to the priest?

23  A   Yes.

24  Q   About this?

25  A   Yes.

1　Q　Did he tell you that he ever sought any professional help?

2　A　No.

3　Q　And just so we're clear, I mean, he's a very, very

4　intelligent man?

5　A　Yes.

6　Q　And certainly, would be aware that he could seek treatment

7　for this?

8　A　Yes.

9　　　　　MS. ZACK:　Nothing further, Your Honor.

10　　　　　THE COURT:　Okay.　Anything else, Neal?

11　　　　　MR. DAVIS:　Just a couple of questions.

12　　　　　THE COURT:　Sure.

13　　　　　　　　　　　RECROSS EXAMINATION

14　BY MR. DAVIS:

15　Q　Are you aware legally that if in the State of Texas if

16　someone learns about child pornography or an offense involving

17　a child that they have a duty to report it to the police?

18　A　I don't know what the priest's situa- -- again, I don't

19　know what –

20　Q　Well, I'm thinking in terms of going to see a professional

21　to try to get help and say, I've got a child porn problem; I

22　download it all the time, whether that person he goes and

23　sees, he has a duty to report it?

24　A　It would probably fall within the same standard that the

25　priest had.　You know, if the priest was not obligated to

1  report it, then a psychologist or psychiatrist probably

2  wouldn't either.

3  Q   Okay.  But you're not really sure if –

4  A   I don't know that for sure.

5  Q   -- that law into the Family Code makes me report it –

6  A   Um-hmm.

7  Q   -- and all professionals, you don't know if that's the

8  case?

9  A   I don't – I don't know it –

10  Q   Okay.

11  A   -- what it entails for them.

12  Q   Okay.

13          No further questions, Your Honor.

14       THE COURT:  Anything else, Sherri?

15       MS. ZACK:  No, Your Honor.

16       THE COURT:  Okay.  You may step down.

17          Thank you, Agent.

18          Any further testimony from the Government?

19       MS. ZACK:  No, Your Honor.

20     (Excerpt of proceedings concluded at 2:17:01 p.m.)

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION


     I, Linda Griffin, court approved transcriber, certify that
the foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the above-
entitled matter.


/s/ Linda Griffin                        November 12, 2015
Linda Griffin                                 Date
Digital Scroll Transcription